AO 106 (Rev. 7/87) Affidavit for Search Warrant ✱

# United States District Court

**MIDDLE** DISTRICT OF **ALABAMA**

In the Matter of the Search of

**232 Lee Road 318, Smiths, Alabama, Lee County, is more particularly described as a brick single family residence. It is brown brick with yellow trim and shutters located on the front of the residence and a center and side entrance.**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER: *3:07mj 75-TFM*

I **Special Agent Steve Ribolla** _____ being duly sworn depose and say:

I am a **Special Agent, DEA** and have reason to believe
<span>Official Title</span>

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

232 Lee Road 318, Smiths, Alabama

in the _____ **MIDDLE** _____ District of _____ **ALABAMA**

there is now concealed a certain person or property, namely (describe the person or property to be seized)

illegal controlled substances and materials relating to the distribution of illegal controlled substances, financial documents relating to money laundering and tax evasion (see affidavit for detailed description)

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
fruits, evidence, and instrumentalities of crimes against the United States,

concerning a violation of Title **21** United States Code, Section(s) **841(a)(1) and 846 and Title 18 USC 1956(a) ,1956(h), 1957, and evidence of failure to file income tax returns in violation of Title 26, USC section 7203**.
The facts to support a finding of Probable Cause are as follows:

See Attached Affidavit of Stephen T. Ribolla

Continued on the attached sheet and made a part hereof.     ☒ Yes     ☐ No

Signature of Affiant
**Stephen T. Ribolla**
**SPECIAL AGENT, DEA**

Sworn to before me, and subscribed in my presence

*July 30, 2007* _____ at _____ **Montgomery, Alabama**
Date                                                                          City and State

*Terry F. Moorer US Magistrate Judge*
Name and Title of Judicial Officer                         Signature of Judicial Officer



232 Lee Road 318, Smiths, Alabama  Lee County

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) |
| **COUNTY OF LEE** | ) |
| **COUNTY OF RUSSELL** | ) |

### I. AFFIANT'S EXPERTISE

I, Stephen T. Ribolla, being duly sworn, depose and state as follows:

1.      I am a Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice and have been so employed for the past seven and a half years. Prior to becoming a SA, I served in several other law enforcement capacities. I began my law enforcement career in 1990 when I became employed as a state probation and parole officer for the State of Florida and served in that capacity until 1994. From 1994 until 1999, I served as a law enforcement instructor and corrections coordinator for the George Stone Criminal Justice Training Center. I was a police officer for the City of Gulf Breeze, Florida, where I served in patrol, investigations, narcotics and training from 1995 to 1999. From February 1999 until July 1999, I served as a law enforcement instructor at the U.S. Treasury Department's Federal Law Enforcement Training Center (FLETC). I also have an extensive education to include 4 months training at the DEA academy in Quantico, Virginia, numerous in service training classes on narcotics and other police related topics, and four college degrees to include an Associates of Science Degree in Law Enforcement, Bachelors of Arts Degree in Criminal Justice, Masters of Science

1

Degree in Sports Science and a Doctorate of Education Degree in Curriculum and Instruction specializing in Public Administration/Law Enforcement. My primary duties and responsibilities involve the investigation of violations of the Controlled Substances Act as found in Title 21, United States Code (USC). I have participated in numerous investigations and search warrants involving drug trafficking and money laundering. I am currently assigned to the Columbus Resident Office of the DEA which is charged with investigating drug trafficking organizations.

2.    I am an "Investigative or Law Enforcement Officer" within the meaning of Section 2510 (7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.    I am currently participating in an investigation of a cocaine distribution organization which is being jointly conducted by special agents of the Drug Enforcement Administration (DEA), Internal Revenue Service Criminal Investigation (IRS-CI) and agents of the Metro Narcotics Task Force (MNTF) concerning the racketeering, narcotics trafficking, and money laundering activities of KELLY DARNELL BATTLE (BATTLE) and others.

4.    As a result of my personal participation in this investigation and my knowledge from reports and conversations with other law enforcement officers, I believe the facts contained in this affidavit show that there is probable cause to believe that the property and items enumerated herein are to be found on the premises of described as 232 Lee Road 318, Smiths, Alabama 36877 (see ATTACHMENT A-1), 117 Highway 165,

2

Phenix City, Alabama 36869 (see ATTACHMENT A-2), and Storage Units #85, #238, #246-E, and #329 at 910 25th Avenue, Phenix City, AL (ATTACHMENT A-3), their curtilage, and any vehicle, building, structure, open or closed container, safe, or vault located on the premises thereon, and constitute evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1); Title 18, United States Code, Section 1956 (a)(1), 1956 (h), and 1957; and Title 26, United States Code, Section 7203, and contraband, the fruits of the commission of these crimes, or things otherwise criminally possessed.

5.      The information and the paragraphs below are furnished in support of this application for a search warrant. The information contained in this affidavit is based upon documents, conversations with agents, summarization of witnesses' testimony and corroborating records, as well as my personal knowledge. Where statements of others are related herein, they are related in substance and in part. Because this affidavit is being submitted for the limited purpose of establishing probable cause to obtain a search warrant, it does not include all the facts that I have learned during the course of the investigation.      The information contained in this affidavit establishes that BATTLE conducted a major narcotics smuggling operation from the State of Arizona into the State of Georgia. BATTLE has been involved in this criminal enterprise since at least January 2004. BATTLE and his associates transferred the cocaine from Arizona to Georgia using semi-trucks.      In addition, BATTLE and his associates conducted illegal financial transactions (money laundering) in the United States. BATTLE and his associates transferred proceeds from the sale of cocaine across state lines by semi-trucks.

3

## II. FACTS AND CIRCUMSTANCES

6.     Since this affidavit is being submitted for the limited purpose of seeking authorization for a search warrant, I have not set forth each and every fact learned during the course of this investigation. The following facts are collective information from an ongoing criminal investigation into BATTLE'S large scale narcotics dealing:

7.     During June 2006, Lt J. Price (assigned to Metro Narcotics at the time) received information from an anonymous source that BATTLE was transporting large quantities of cocaine from Mexico to Georgia for a known drug dealer named Jerry Davis. The source also stated BATTLE was laundering drug money for Davis.  Davis was previoulsy arrested in June 2005 in California with approximately 250 kilos of cocaine and \$1.8 million dollars in U.S. Currency. Davis plead guilty in Federal Court in South Carolina for Conspiracy to Distribute 5 kilograms or more of cocaine and was eventually sentenced to approximately 40 years in prison.  In June 2006, Davis was interviewed by DEA in South Carolina.  Davis relayed the following information regarding BATTLE'S involvement with Davis' drug enterprise.

  a)     In the late 1990's, Davis planned to use several individuals to function as drug couriers to transport multi-kilos of cocaine from Georgia to Michigan. Battle was one of these couriers.

  b)     In 2001 or 2002, Davis began using semi-trucks and tractor trailors as his main source for moving large shipments of cocaine from one location to another.   Davis had BATTLE obtain a commercial driver's license and

4

BATTLE began driving semi-trucks for Davis. Agents determined that BATTLE currently has a valid Alabama CDL license.

c)    Davis purchased the semi-trucks and tractor trailers and registered them through a front company created by Davis called K.B. Logistics. Davis denied that "K.B." stood for KELLY BATTLE, saying it had no meaning. Davis had another individual purchase the semi-trucks in their name which included a Kenworth, Volvo, and Freightliner. All vehicles were purchased in the Atlanta area. Davis stated he thought the Freightliner was inoperable, but as far as he knew, BATTLE was still using the other semi-trucks to transport cocaine for another individual who took over for Davis. A check of vehicles registered to BATTLE include a 1997 Freightliner semi-truck, 1985 refrigerator trailer, and 1996 refrigerator trailer.

d)    In 2002, Davis met an individual in Philadelphia, PA, who was interested in obtaining large quantities of cocaine. Davis stated the multi-kilo loads he provided to this individual was transported to a warehouse in Philadelphia by semi-trucks, usually driven by BATTLE or BATTLE'S associate (name unknown). Once at the warehouse, BATTLE (who also was a fork lift operator) would unload the cocaine from the truck. The cocaine would then be loaded into panel vans (also registered to K.B. Logistics).

e)    Davis stated he paid BATTLE up to $300,000.00 per load, but sometimes BATTLE would move a load for free. Per Davis, BATTLE probably moved 20-30 loads per year, and did so for three or four years. Davis stated he has

5

paid BATTLE at least $2,000,000.00 over the course of their dealings.

8.    DEA agents in South Carolina interviewed a witness in the Jerry Davis case. The witness, LaVentris Holmes, was asked by Davis to maintain a payroll for a black male from Columbus, GA, called "KELLY" who owned K.B. Logistics, a trucking company out of Atlanta, GA. Holmes stated she learned "KELLY" ran trucks from the east coast to the west coast.

9.    On June 29, 2005, the DEA Task Force in New Jersey executed a search warrant on a residence located at 673 South Orange Avenue in Lexington, NJ. Upon execution of the search warrant, a large quantity of cocaine, $913,285.00, and five vehicles were seized. All vehicles had hidden compartments and trap doors, and some contained large amounts of currency and/or cocaine. One of these vehicles, a 2003 Chevrolet Express conversion van, was owned by BATTLE. Although this vehicle was searched and no contraband or currency was located in the vehicle, the K-9 unit was alerted to a natural side panel which showed abnormal and unusual wear. BATTLE currently owns a 2004 Chevrolet Express van (ATTACHMENT B, Item 43).

10.    On April 25, 2007, at approximately 10:30 AM, a 1999 Freightliner semi-truck carrying an empty refrigerator trailer was stopped at the Sanders Port of Entry (AZ) at I-40 westbound from New Mexico. The driver of the vehicle was George Humbar. The Apache County Drug Task Force Drug Detection K-9 alerted on the tractor trailer, indicating the presence of an illegal drug and/or drug odor. Agents located 12 bundles of U.S. currency that was vacuumed sealed in clear plastic. The K-9 also alerted to the bundles of currency. The currency contained in the 12 bundles totaled $283,595.00. Humbar denied ownership

6

of the money and signed a Disclaimer of Ownership of Currency Form. Humbar stated he saw the currency under the bed of the sleeper, but did not know who it belonged to. Humbar stated he drove for a friend called "D" in Atlanta. Humbar stated he called "D" about the money when he first saw it. "D" told Humbar, "Don't worry about it".

11.    Humbar stated he drove for K & K Logistics located at 3515 Summerville Road #163, Phenix City, AL. His friend "D" helped him obtain this truck driving job. He interviewed with K & K Logistics over the telephone, faxed K & K Logistics a copy of his driver's license, and could not remember the names of the individuals at K & K Logistics. Humber stated this is the third time he has traveled to AZ using this same semi-truck with an empty trailer. Humber stated he drives from Atlanta, GA, to AZ, leaves the locked semi-truck and empty trailer at the Flying J Truck Stop at Exit 137 on I-10, and calls "D". Humber then catches a taxi to the Phoenix, AZ, airport where a pre-paid airline ticket is waiting for him and flies home to Fort Lauderdale, FL. Humber stated "the guy" on the phone at K & K Logistics told him he would be driving to the west coast, FL, NJ, MA, and TX. Humber stated "D" is the dispatcher between himself and K & K Logistics. Humber stated that he began this third trip by flying to NJ and driving the semi-truck with an empty trailer to Atlanta, GA. From Atlanta, GA, the trailer was loaded with fish and unloaded in Dallas, TX, where he then reloaded with tissue and unloaded in Amarillo, TX. From Amarillo, TX until this incident, the trailer has been empty.

12.    The 1999 Freightliner semi-truck is registered to K & K Logistics at 3515 Summerville Road #163 in Phenix City, AL. BATTLE'S signature appears on the Alabama Department of Motor Vehicle Registration issued 01/26/07. Metro Agents verified that

7

3515 Summerville Road #163 in Phenix City, AL, is a post office box rented at a business called "The Mailbox". Records show the post office box was obtained on 01/10/06 by BATTLE who listed the box under K & K Transportation with the address of 117 Highway 165, Phenix City, AL. BATTLE listed his business type as "Big Trucking and Freight Business". BATTLE provided The Mailbox with a copy of his AL Driver's License with an expiration date of 10/11/06. Metro agents verified the driver's license photo as the same KELLY DARNELL BATTLE they are familiar with.

13.     Metro agents verified K & K Logistics, Inc. was incorporated on 1/19/06 with the Alabama Secretary of State and listed BATTLE as the registered agent and incorporator using the address of 3515 Summerville Rd., Ste. 163 in Phenix City, AL.

14.     The refrigerator trailer is registered to BATTLE at 117 Hwy 165, Phenix City, AL. The address of 117 Hwy 165 is a residence rented by BATTLE.

15.     Evidence located in the semi-truck also included Driver's Daily Log records showing BATTLE had driven the same semi-truck in December 2004, January 2006, April 2006, December 2006, and February 2007 with travel in PA, GA, TX, NM, AZ, and CA. Additional evidence included truck repair receipts listed in the name of BATTLE, K & K Logistics, Elite Transportation, and K.B. Logistics. In addition, mail addressed to BATTLE at 117 Hwy 165 was also found in the semi-truck.

16.     Motor Carrier Management Information System records show BATTLE driving this semi-truck per inspection dates 06/24/04 in AZ and 10/07/06 in NM.

17.     Agents in AZ spoke with DEA in Flagstaff, AZ, in reference to this incident. DEA advised that K & K Logistics, Inc. is formally known as K & B Trucking. DEA also

8

advised K & B Trucking was a cocaine distribution network operating between AZ, CA, GA, and SC.

18.     On April 26, 2007, Leshan Hayden telephoned the Apache County Sheriff's Office in AZ regarding the 1999 Freightliner semi-truck and stated he was the operation's manager for K & K Logistics. Hayden denied knowledge and/or ownership of the currency. Hayden first stated that he didn't know Humber was in AZ and that the truck was suppose to be parked "at the house" located at 3515 Summerville Road #163 in Phenix City, AL. After questioned about the delivery loads Humbar referred to in paragraph 11, Hayden spoke to someone referred to as "Bob" in the background, acknowledged the load of fish from GA, denied the load of tissue from TX to AZ, and then told agents Humber wasn't suppose to be in AZ.

19.     Agents verified through Accurint, Autotrack, LexisNexis, and utility sources that BATTLE maintains a residence located at 232 Lee Road 318, Smiths, AL.

20.     A check of Tallapoosa River Electric Cooperative (electric company) revealed the subscriber to power at 232 Lee Road 318, Smiths, AL, is BATTLE. Utility records show billing amounts per month as follows: 06/06-$87.56, 07/06- $173.10, 08/06- $205.23, 09/06-$212.74, 10/06-$137.34, 11/06-$104.98, 12/06-$109.70, 01/07-$122.11, 02/07-$167.88, 03/07-$265.52, 04/07-$53.41, and 05/07-$57.12. These amounts show a normal amount of usage until the last two months which are significantly lower. In addition, cancelled checks of BATTLE show BATTLE paying $1,300.00 per month in rent to ReMax Realty with the notation "232 Lee Rd 318".

21.     From May 2007 through July 2007, Metro Agents conducted surveillance at

9

232 Lee Road 318, Smiths, AL, and observed a minimum of 8 vehicles and a maximum of 10 vehicles parked in the driveway and front yard of this residence. Vehicle registration checks revealed that most of the vehicles on the premises are registered to BATTLE.

22.    Agents verified through Accurint, LexisNexis, and utility sources that BATTLE also maintains a residence located at 117 Highway 165, Phenix City, AL.

23.    A check of Tallapoosa River Electric Cooperative (electric company) revealed the subscriber to power at 117 Hwy 165 in Phenix City, AL, is BATTLE. Utility records show lower than normal usage billing amounts per month as follows: 05/2006-$41.00, 06/2006-$41.59, 07/2006-$37.44, 08/2006-$40.35, 09/2006-$32.00, 10/2006-$29.73, 11/2006-$29.13, 12/2006-$28.53, 01/2007-$29.03, 02/2007-$30.00, 03/2007-$30.00, 04/2007-$25.30. These amounts are possibly indicative of a location used  to conceal contraband, documents, and/or assets. In addition, cancelled checks of BATTLE show BATTLE paying $250.00 per month in rent to W.H. Carden with the notation "117 Hwy 165".

24. From May 2007 through July 2007, Metro Agents also conducted surveillance at 117 Hwy 165, Phenix City, AL, and observed three vehicles in the front yard and an unknown amount of vehicles in the rear of the residence. Vehicle registration checks revealed the three vehicles on the premises are registered to BATTLE .

25.    During September 2006, Lt. S. Armburst (Harris County Sheriff's Office) contacted Lt. Price and informed him there was a house located at 11017 Warm Springs Road in Midland, GA, that had ten to fifteen vehicles parked there at all times. Armburst also stated there was never any activity at the residence.

10

26.    Agents verified through Accurint, LexisNexis, and utility sources that BATTLE also maintains the residence located at 11017 Warm Springs Road in Midland, GA.

27.    A check of Georgia Power utility records revealed that the subscriber to power at 11017 Warm Springs Road in Midland, GA, is BATTLE. Power records shows a lower than normal usage inconsistent with an occupied dwelling that is approximately 1800 sq ft (heated and cooled) as follows: 09/06-$79.29, 10/06-$55.36, 11/06-$75.83, 12/06-$38.59, 01/07-$27.93, 02/07-$40.49, and 03/07-$32.37. These amounts are possibly indicative of a location used to conceal contraband, documents, and/or assets. In addition, cancelled checks of BATTLE show BATTLE paying $1,200.00 per month in rent to Jack E. Palmer Realty with the notation "11017 Warm Springs Rd".

28.    Beginning February 2007 through July 2007, Metro Agents conducted surveillance at 11017 Warm Springs Road, Midland, GA, and observed a minimum of 11 vehicles and a maximum of 13 vehicles parked in the drivway and front yard of the residence.

29.    Agents verified through Accurint, LexisNexis, and utility sources that BATTLE also maintains a residence located at 5939 Warrior Way in Columbus, GA.

30.    A check of Georgia Power utility records revealed that the subscriber to power at 5939 Warrior Way in Columbus, GA, is BATTLE.

31.    Agents also received information that BATTLE was residing at 5939 Warrior Way.    On May 22, 2007, BATTLE was arrested for Battery (Family Violence) and Terroristic Threats at 5939 Warrior Way in Columbus, GA. BATTLE listed this address as his home address.

11

32.    On May 23, 2007,  Metro Agents observed a 2003 Hummer, 2004 Chevrolet Van, 1993 Chevrolet Caprice, and an unknown vehicle in the driveway of 5939 Warrior Way.  Vehicle checks revealed all three vehicles are registered to BATTLE.

33.    BATTLE is renting four storage units (#85, #238, #246-E, and #329) from Mini Storage Units of Phenix City located at 910 25th Ave in Phenix City, AL.  The business manager advised agents that BATTLE keeps four expensive vehicles including a Chevrolet Corvette, Cadillac Escalade, and two unknown vehicles in his storage units.  The manager stated BATTLE comes by the units weekly, drives the vehicles around, and puts them back in storage the same day.

34.    Federal seizure warrants are being obtained for all known vehicles owned, registered, or titled to BATTLE.  Federal search warrants are also being obtained for two additional residences located at 11017 Warm Springs Road, Midland, GA, and 5939 Warrior Way, Columbus, GA, which BATTLE is also maintaining.

## III. KNOWN ASSETS

35.    A computer check with the Alabama Law Enforcement Tactical System (LETS) showed that BATTLE has 38 vehicles registered in his name. 26 of the 38 vehicles are titled to BATTLE with no outstanding lien.    DEA checks revealed Battle has 42 vehicles registered in his name.  See ATTACHMENT B for a complete list of vehicles registered to BATTLE.  The more expensive vehicles, also included on ATTACHMENT B, are as follows:

12

| Year | Model | VIN |
|------|-------|-----|
| 2006 | Chrysler 300 | 2C3KA63H4H217974 |
| 2005 | Impala SS | 2G1WP551659123926 |
| 2004 | Chevrolet Express Van | 1GBFG15TX41146456 |
| 2003 | Chevrolet Express Van | 1GBFG15T131198461 |
| 2003 | Mercedes-Benz E500 | WDBUF70J73A160360 |
| 2003 | GM Yukon XL | 1GKFK66U93J201223 |
| 2003 | Impala SS | 2G1WH52K63942346 |
| 2003 | Hummer H2 | 5GRGN23U53H133691 |

BATTLE has no known auto dealership license or auto business.

## IV. FINANCIAL INFORMATION

36.    Federal tax return information was obtained via Ex Parte Order and disclosed no federal tax returns on file for BATTLE for the years 2003, 2004, 2005 and 2006. In addition, no Forms W-2 or Forms 1099-MISC were issued to BATTLE for these same years. DEA checks with the Department of Labor of Alabama and Georgia for BATTLE were negative for employment. The Georgia Department of Revenue revealed no state tax returns were filed by BATTLE for years 2003 through 2006. It us unknown at this time if BATTLE has filed any Alabama State Tax Return.

37.    Alabama Secretary of State records reveal that BATTLE is incorporated in Russell County, AL, under the name of K & K Logistics, Inc. The date of incorporation is 01/19/06 and the nature of the business is listed as transportation. BATTLE is listed as

president with the address of 3515 Summerville Rd., Ste. 163, Phenix, City, AL. Leshan Hayden is listed as operations manager.

38.    Georgia Secretary of State corporate records show BATTLE is listed as the president of Elite Freight & Carriers, Inc. The incorporation date is 4/19/05 with the address of 745 Hansell St. #775 in Atlanta, GA 30312. LeShan Hayden is currently listed as the CEO of this corporation. Agents found no other Georgia based businesses associated with BATTLE.

39.    Information obtained from Members United Credit Union relating to BATTLE'S account #12156 reveal BATTLE is associated with KB LOGISTIC as printed on his checks as follows: KB LOGISTIC KELLY BATTLE 117 Hwy 165, Phenix City, AL.

40    Bank account information obtained to date has been reviewed and itemized below. Deposits consist primarily of cash in denominations of $20.00 or less. Deposits are made as needed to maintain a positive bank balance. All cash deposits are under $10,000.00, thus avoiding a Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on currency transactions which exceed $10,000.00. Deposits consisting of large sums of currency are typical of drug dealers who receive their illegal proceeds in the form of cash.

14

| **Bank Accts: Deposit Items** | **Year 2005** | **Year 2006** | **Year 2007** |
|---|---|---|---|
| Member's United CU #12156 * | $15,300.00 | $ 8,079.00 | $ 5,775.00 |
| Member's United CU #12155 * | $90,180.00 | $64,375.00 | $53,320.00 |
| Bank of America #7592510262 ** | n/a | $30,860.00 | |
| Bank of America #6662140255 ** | n/a | $500.00 | |
| **TOTAL DEPOSITS** | **$105,480.00** | **$103,814.00** | **$59,095.00** |

* Members United Credit Union deposits are through 6/30/2007

** Bank of America deposits are through 6/30/2006

41.    IRS Forms 8300, Report of Cash Payments Over $10,000 Received in a Trade or Business, are required to be filed with the IRS by any person engaged in a trade or business who receives more than $10,000 in one transaction or two or more related transactions.  Four (4) Forms 8300 were filed on BATTLE  by Murray's Auto Sales in Columbus, GA, for the purchase of used vechicles.  BATTLE listed his occupation as truck driver and self employed.  During 2006, BATTLE purchased the following vehicles with currency:

| Year | Model | Cash Paid |
|---|---|---|
| 2002 | Cadillac Deville | $15,438.00 |
| 2000 | Ford Expedition | $11,000.00 |
| 1995 | Chevrolet Impala SS | $13,350.00 |
| 1994 | Chevrolet Impala SS | $12,396.00 |
| | | $52,184.00 |

15

42.    A review of loan records obtained from Members United Credit Union dated 04/20/05, 07/19/05, 08/01/06, 10/03/06, and 06/11/07, revealed BATTLE is listed as owner of Elite Transportation receiving a monthly income of $8,800.00. The address used on the loan documents is 117 Hwy 165, Phenix City, AL. In addition, BATTLE made extra loan payments in 2006 towards these loans totaling $60,082.00 in currency.

43.    On March 15, 2007, BATTLE reported to the Columbus Police Department that his 2000 Lincoln Navigator was car jacked along with $11,000.00 in U.S. currency. Later in March 2007, another unrelated stolen vehicle was recovered that contained property from BATTLE'S Lincoln Navigator. Columbus Police recovered 46 sets of car keys and paperwork belonging to BATTLE. The paperwork included cash receipts for $1,627.42, $4,718.43, and $739.02 in the name of BATTLE. BATTLE positively identified the car keys which were released to him.

44.    The investigation to date has not disclosed the disposition of the $2,000,000.00 listed in paragraph 7e that BATTLE reportedly received from his drug trafficking co-conspirator.

45.    During March 2007, a mail cover was conducted on the address of 117 Hwy 165 in Phenix, City, AL. During this time, BATTLE'S mail consisted of bank statements, credit card statements, insurance bill, and utility bills.

## V. AFFIANT'S KNOWLEDGE

46.    My training and participation in investigations of drug traffickers and others involved in illegal businesses and activities have given me knowledge to recognize the

16

methods used by drug traffickers and money launderers to conceal their assets, income, and activities from the government and other third parties. Based on my training and experience, I know the following:

    (a)    Drug traffickers often place assets in names other than their own in order to avoid detection of these assets by government agencies. Even though these assets are in other person's names, or in corporate or business names, the drug dealers continue to use these assets and exercise dominion and control over them.

    (b)    Drug traffickers generate substantial profits as a result of illegal drug dealing, which courts have recognized as probative evidence of crimes motivated by greed, in particular, trafficking in narcotics and dangerous drugs. These persons often maintain on hand large amounts of U.S. currency in order to operate and finance their ongoing drug distribution enterprise, often in small denominations.

    (c)    Drug traffickers maintain books, records, receipts, travel records, gasoline receipts, notes, ledgers, airline tickets, money orders, cashier's checks, wire transfers, bank records, and other papers relating to the transportation, ordering, sale, purchase, and distribution of controlled substances. The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the drug traffickers have ready access to them, as in their houses, places of business, or other locations over which they exercise dominion and control and at the locations where controlled substances and the

17

paraphernalia associated with controlled substances are stored, packaged, and weighed, and at places where vehicles and other equipment are maintained which are utilized in the distribution and transportation of controlled substances.

(d)     It is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, to include jewelry, other expensive personal property, and records of drug transactions in secure locations within their residences and/or businesses for ready access and to conceal them from law enforcement.

(e)     Persons involved in drug trafficking conceal in secure locations, with ease of access, caches of drugs, large amounts of currency, financial instruments, proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities.

(f)     That those who launder the illegal proceeds of drug trafficking and other unlawful activities often maintain records at their residences where only they have custody and control of such documents.    These records include records of income and expenses, such as profit and loss statements and income and expense journals.

(g)     When drug traffickers amass large proceeds from the sale of drugs, they then attempt to "legitimize" these profits. To accomplish these goals, they utilize, including but not limited to, foreign and domestic banks and their

18

attendant services, safety deposit boxes, cashier's checks, money drafts, money orders, wire transfers, and business fronts. Drug traffickers have ready access to these items often in their houses, places of business, and other locations over which they exercise dominion and control, and often in proximity to illicit drugs.

(h)     That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state or local agencies. In order to "legitimize" their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

(i)     Drug traffickers often seek the help of money launderers to "legitimize' their profits and to move large amounts of currency to banks, financial institutions, overseas and to businesses, where the profits can be spent. The money launderers who offer these services do it for a fee and maintain records for the trafficker to document the transactions. Evidence includes checking and savings account records consisting of monthly statements, duplicate deposit slips, and cancelled checks reflecting the deposit and disbursement of funds.

19

These records are usually secured in the residence or business of the money launderer.

(j)     That businesses maintain books and records in the ordinary course of business.

(k)     That in order to prepare Federal income tax returns it is necessary to maintain journals, ledgers, bank statements, invoices, receipts, and other papers relating to financial transactions.

(l)     That money launderers often separate such records from their commercial enterprises. I know that they often keep separate ledgers, accounting records, telephone and communication records and related documents in secure locations at their residence to insure privacy from legitimate employees and protection from disclosure to law enforcement authorities.

(m)    It is common for drug traffickers to travel to major distribution centers and cities to sell or distribute drugs. The methods of transportation include, but are not limited to, commercial airlines, private airplanes, rental automobiles, private automobiles, and government and contract mail carriers, and that drug traffickers routinely keep and maintain these records in locations for easy access, often in their houses, places of business, and locations at which they or their trusted associates exercise dominion and control, and often in proximity to illicit drugs.

(n)    Drug traffickers often keep letters and other documents reflecting communications between associates. Drug traffickers commonly maintain

addresses or telephone numbers in books, papers, and rolodexes, and on cards and pieces of papers, which reflect names, nicknames, addresses, and/or telephone numbers, including, but not limited to, cellular telephone numbers and pager numbers, for their associates in the trafficking organization, and they keep those in their home, places of business, and other places over which they exercise dominion and control, and in the homes of trusted associates, and they use personal computers to store this information. Phone billing records are also kept reflecting telephone activity with associates.

(o)   Drug traffickers frequently take or cause to be taken photographs, videotapes, and audio tapes of themselves, their associates, their properties, and their contraband, and these traffickers usually maintain these photographs, videotapes, or audio tapes at their residences or businesses, in safety deposit boxes, or on the individual's person.

(p)   Drug traffickers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting and distributing controlled substances at places under their control or in the control of their trusted associates and in close proximity to the locations of the controlled substances themselves. Additionally, drug traffickers often separate their caches of drugs by keeping them and drug paraphernalia in the residences of close associates.

(q)   Individuals engaged in the distribution of controlled substances will conduct

21

their operations in a manner designed and intended to minimize interference from law enforcement. Methods employed by large-scale narcotics distributors include, but are not limited to, the use of digital pagers (often employing message codes), cellular telephones, radio communications, pay telephones, and hard line telephones, and the use of guarded, vague, or coded language when discussing and planning the distribution of controlled substances.

(r)    Individuals engaged in illicit narcotics trafficking maintain records, ledgers, books of account, and other documents related to their illegal business, as well as documents relating to the purchase, storage, and sale of drugs. Such traffickers frequently "front" (provide for credit) drugs to trusted associates, and such credit arrangements further necessitate the creation and maintenance of accurate records.

(s)    In the case of especially longstanding and/or large-scale drug trafficking organizations, the principals of such organizations often compile and maintain documents relating to businesses, investments, and other income derived from illicit drug business since the proceeds of illegal narcotics transactions are often filtered through legitimate or "front" businesses in order to conceal and disguise the true origin and nature of such proceeds. This process of attempting to legitimize narcotics proceeds by giving them the appearance of lawful origin is known generally as "money laundering". Usually, the more profitable a particular narcotics enterprise is, the more

22

likely are its principals to engage in money laundering.

(t)     Individuals engaged in illicit narcotics trafficking usually keep their most important business records close at hand in their homes or businesses, or in the hands of very trusted associates. It is very common for large-scale traffickers to maintain safes or other locked containers, or false compartments in the homes and businesses, places under their control, and in the homes and businesses of trusted associates, for the storage of money from the sale of controlled substances, drug records, and other important documents. It is also very common for such traffickers to maintain multiple storage sites so that one search by law enforcement officials will not result in the loss of all of their records and currency.

(u)     Drug traffickers who believe themselves to be in great danger of interference from rival drug traffickers or from law enforcement often maintain weaponry at their homes or at other locations where they store drugs, money, and/or records.

(v)     Drug traffickers often use vehicles to transport controlled substances for distribution, and  purchased with the proceeds of drug trafficking, and those vehicles are often maintained at the places where controlled substances are temporarily stored or housed.

(w)     Drug traffickers utilize a number of devices to communicate with their criminal associates, including, but not limited to, telephones, cellular and mobile telephones, and digital display paging devices, and they maintain

23

these records in their homes and places of business.

(x)    Drug traffickers who operate businesses as a front for their drug trafficking businesses commonly maintain at their residences, places of business, and businesses, records such as utility and telephone bills, evidence of occupancy or ownership, deeds, operator licenses, financial records (such as financial institution records, including monthly or other statements of accounts), checks, check registers, canceled checks, and documents that reflect the purchase/ownership of assets and the expenditure of monies, including those made with United States currency.

(y)    Individuals who have purchased property maintain at their residences, their at places over which they exercise dominion or control, closing documents, financial contracts, surveys and deeds, including warranty deeds, copies of cashier's checks, and receipts of monies paid to sellers.

(z)    Individuals who construct buildings or other improvements on their properties maintain at their residences, their businesses, or at places over which they exercise dominion or control, records of construction, including receipts of payments to contractors, estimates from contractors, and/or receipts for building materials.

(aa)   That drug traffickers also keep evidence of expenditures for personal living expenses, such as invoices and receipts reflecting purchases of personal type items such as food, clothing, entertainment, household payments, utilities, and other personal types of needs.

24

(bb)  The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, dealing in illegal controlled substances.  See United States v. Chagra, 669 F.2d 241 (5th Cir. 1982).

(cc)  It is common for drug traffickers to maintain the records described in paragraphs (c), (e), (f), (g), (h), (i), (j), (k), (l), (r), and (s) in the hardware of personal computers and on software (such as discs) used in conjunction with the computer.

47.    This affidavit is made in support of an application for a search warrant authorizing the seizure of books, papers, records, safety deposit box records, keys, receipts, notes, cash, jewelry, ledgers, documents, photographs, negatives, film, video cassettes, airline tickets, travel documents or papers, telephone books, address books, bank and other financial records, checks, safes, locked containers and concealed compartments and contents, check registers, hotel records, deeds and evidence of occupancy and ownership of premises, documents that reflect the purchase and ownership of assets, vehicles, land, buildings, and storage locations used in conjunction with the transportation, ordering, sale, purchase, and distribution of controlled substances, and equipment or automobiles utilized in transporting, ordering, sale of, purchase of, and distribution of controlled substances, laundering of drug proceeds, automobiles purchased with drug proceeds, and income records. ATTACHMENT C "ITEMS TO BE SEIZED" is attached specifically detailing these items.

25

## VI. CONCLUSION

48.    Based on the aforementioned facts, your affiant requests a warrant to search the premises described in ATTACHMENT A-1 (232 Lee Road 318, Smiths, AL), ATTACHMENT A-2 (117 Highway 165, Phenix City, AL), and ATTACHMENT A-3 (Storage Units #85, #238, #246-E, and #329 located at 910 25th Avenue in Phenix City, AL). I respectfully submit there is probable cause to believe that the SUBJECT PROPERTIES contain evidence relating to the possession with the intent to distribute, and the conspiracy to commit possession with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841 (a) (1), and evidence of money laundering in violation of Title 18, United States Code, Sections 1956 (a) (1), 1956 (h), and 1957, and evidence of failure to file income tax returns in violation of Title 26, United States Code Section 7203.

Stephen T. Ribolla
Special Agent
Drug Enforcement Administration
Columbus, Georgia

Subscribed and sworn to before me
this ____th day of July, 2007.

Terry F Moorer      , U.S. Magistrate Judge

26

# ATTACHMENT A-1

**232 Lee Road 318, Smiths, Alabama, Lee County, is more particularly described as a brick single family residence. It is brown brick with yellow trim and shutters located on the front of the residence and a center and side entrance.**



# ATTACHMENT A-2

**117 Highway 165, Phenix City, Alabama, Russell County, is more particularly described as a wood or siding single family residence. It is grey wood with burgundy trim and shutters located on the front of the residence and a center entrance. It has an attached wooden privacy fence. The mail box in front of the house displaying numbers 117.**



# ATTACHMENT A-3
(page 1 of 2)

**910 25th Avenue, Unit 85, Unit 238, Unit 246-E, and Unit 329 in Phenix City, Alabama, Russell County, is more particularly described as 4 storage units at Mini Storage Units of Phenix City.**





# ATTACHMENT A-3

(page 2 of 2)

910 25th Avenue, Unit 85, Unit 238, Unit 246-E, and Unit 329 in Phenix City, Alabama, Russell County, is more particularly described as 4 storage units at Mini Storage Units of Phenix City.







**ATTACHMENT B**
**VEHICLES REGISTERED TO KELLY BATTLE**

| Item Number | Listed Owner | Asset | Description | Registration Number | VIN | Known Location |
|---|---|---|---|---|---|---|
| 1 | Battle, Kelly D. | 1992 Acura Integra | 2 door, white in color | 57A064M (AL) | JH4DA9363NS017677 | |
| 2 | Battle, Kelly | 1988 Honda Accord | 2 door, gold in color | 57A013J (AL) | JHMCA5468JC052495 | |
| 3 | Battle, Kelly Darnell | 2003 Chevrolet Express | silver in color | CN0903 (AL) | 1GBFG15T131198461 | |
| 4 | Battle, Kelly Darnell | 2003 Chevrolet Impala | 4 door, silver in color | CN0973 (AL) | 2G1WH52K639423246 | |
| 5 | Battle, Kelly Darnell | 1997 Freightliner truck | | 502340 (AL) | 2FUYDSEB1VA772654 | |
| 6 | Battle, Kelly Darnell | 1996 Refrigerator trailer | silver in color | 80TR187M (AL) | 1UYVS2483TU782935 | |
| 7 | Battle, Kelly Darnell | 1985 Refrigerator trailer | silver in color | 57TR0512 (AL) | 1GRAA96Z0FS106501 | |
| 8 | Battle, Kelly Darnell | 2000 Chevrolet Impala | 4 door, white in color | 12A320N (AL) | 2G1WH55K4Y9179339 | |
| 9 | Battle, Kelly Darnell | 2000 Lincoln Navigator | white in color | 7K69R (AL) | 5LMEU27A9YLJ18216 | |
| 10 | Battle, Kelly D. | 1999 Ford Expedition | blue in color | CG5579 (AL) | 1FMRU17L9XLA62518 | |
| 11 | Battle, Kelly D. | 1980 Chevrolet Camaro | blue in color | 57A012J (AL) | 1P87JAL579640 | |

**ATTACHMENT B**
**VEHICLES REGISTERED TO KELLY BATTLE**

| Item Number | Listed Owner | Asset | Description | Registration Number | VIN | Known Location |
|---|---|---|---|---|---|---|
| 12 | Battle, Kelly D. | 1978 Ford F-150 pickup truck | white in color | 57A014J (AL) | F15BNAK6461 | |
| 13 | Battle, Kelly D. | 2003 GMC Yukon | white in color | ES918 (AL) | 1GKFK66U93J201223 | Lee Road |
| 14 | Battle, Kelly Darnell | 2002 Cadillac DeVille | 4 door, white in color | 8K86L (AL) | 1G6KF57992U127370 | Hwy 165 |
| 15 | Battle, Kelly D. | 1993 Chevrolet Caprice | 4 door, white in color | 7K72R (AL) | 1G1BL53E6PW132846 | |
| 16 | Battle, Kelly D. | 1987 Chevrolet Caprice | 4 door, white in color | 7K70R (AL) | 1G1BU51H8H9143129 | |
| 17 | Battle, Kelly D. | 1999 Ford F-150 pickup truck | maroon in color | CN0916 (AL) | 1FTRX17W7XNC10112 | |
| 18 | Battle, Kelly | 1977 Pontiac Grand Prix | 2 door, maroon in color | CN0971 (AL) | 2K57Z7A233403 | |
| 19 | Battle, Kelly Darnell | 1991 Chevrolet C1500 pickup truck | maroon in color | 57C938A (AL) | 2GCEC19K7M1129631 | Hwy 165 |
| 20 | Battle, Kelly Darnell | 2003 AMG Hummer | pewter in color | 7K73V (AL) | 5GRGN23U53H133691 | Warriors Way |
| 21 | Battle, Kelly D. | 1994 Toyota Landcruiser | red in color | 8K80L (AL) | JT3DJ81W5R0080588 | Warm Springs |
| 22 | Battle, Kelly D. | 1998 Mercury Marquis | 4 door, red in color | ADK618 (AL) | 2MEFM75W7WX622317 | |

**ATTACHMENT B**
**VEHICLES REGISTERED TO KELLY BATTLE**

| Item Number | Listed Owner | Asset | Description | Registration Number | VIN | Known Location |
|---|---|---|---|---|---|---|
| 23 | Battle, Kelly | 1989 Cadillac DeVille | 4 door, blue in color | CK3088 (AL) | 1G6CD5151K4364497 | Warm Springs |
| 24 | Battle, Kelly | 1991 Honda Accord | 4 door, brown in color | CK3001 (AL) | JHMCB7656MC042484 | |
| 25 | Battle, Kelly | 1983 Olds Cutlass | 2 door, gold in color | CN0970 (AL) | 1G3AR47A4DM384556 | |
| 26 | Battle, Kelly D. | 1997 Ford Explorer | gold in color | 7K62R (AL) | 1FMDU32E4VUB97007 | |
| 27 | Battle, Kelly | 1993 Jeep Cherokee | green in color | CG5465 (AL) | 1J4GZ58S4PC530529 | |
| 28 | Battle, Kelly D. | 1999 Honda Accord | 4 door, gray in color | 7K06H (AL) | 1HGCG5643XA095322 | |
| 29 | Battle, Kelly Darnell | 2002 Ford F-150 pickup truck | gray in color | 7K55R (AL) | 1FTRW07342KD16806 | |
| 30 | Battle, Kelly Darnell | 1996 Mercury Marquis | 4 door, silver in color | CN0937 (AL) | 2MELM74W5TX668230 | Warm Springs |
| 31 | Battle, Kelly Darnell | 2006 Chrysler 300C | 4 door, silver in color | 7K23H (AL) | 2C3KA63H46H217974 | |
| 32 | Battle, Kelly D. | 1997 Lexus LS400 | 4 door, silver in color | 2810FW (AL) | JT8BH28F6V0084501 | |
| 33 | Battle, Kelly D. | 2003 Mercedes E500 | 4 door, silver in color | 8K88L (AL) | WDBUF70J73A160360 | |

Page 3 of 5

**ATTACHMENT B**
**VEHICLES REGISTERED TO KELLY BATTLE**

| Item Number | Listed Owner | Asset | Description | Registration Number | VIN | Known Location |
|---|---|---|---|---|---|---|
| 34 | Battle, Kelly Darnell | 1999 GMC Yukon | silver in color | 8K96L (AL) | 1GKEC13R6XJ733904 | Warm Springs |
| 35 | Battle, Kelly D. | 1996 Chevrolet Suburban | black in color | 7K64R (AL) | 1GNEC16R6TJ400353 | Warm Springs |
| 36 | Battle, Kelly Darnell | 1994 Chevrolet Impala | 4 door, black in color | 7K59R (AL) | 1G1BN52P0RR158325 | |
| 37 | Battle, Kelly Darnell | 1996 Chevrolet Impala | 4 door, black in color | 7K56R (AL) | 1G1BL52P0TR157138 | |
| 38 | Battle, Kelly Darnell | 1999 Mercury Marquis | 4 door, black in color | CK3028 (AL) | 2MEFM75W2XX626745 | Warm Springs |
| 39 | Battle, Kelly Darnell | 1994 Lexus LS400 | 4 door, black in color | EY456 (AL) | JT8UF11E5R0192477 | |
| 40 | Battle, Kelly Darnell | 2000 Chevrolet Monte Carlo SS | Silver | BQ90CB (GA) | 2G1WX12K8Y9306349 | |
| 41 | Battle, Kelly Darnell | 1995 Chevrolet Camaro | Silver | WI6F56 (GA) | 2G1FP22P1S2225386 | Hwy 165 |
| 42 | Battle, Kelly Darnell | 1985 Chevrolet Monte Carlo | Maroon | No Tag Assigned (GA) | 1G1GZ37G0FR214766 | |
| 43 | Battle, Kelly Darnell | 2004 Chevroloet Express Van | Black | 8K87L (AL Wildlife) | 1GBFG15TX41146456 | Warriors Way |
| 44 | Battle, Kelly Darnell | 2005 Chevrolet Impala Super Sport | Black | 7K07H (AL Wildlife) | 2G1WP55165912392 6 | Lee Road |

**ATTACHMENT B**
**VEHICLES REGISTERED TO KELLY BATTLE**

| Item Number | Listed Owner | Asset | Description | Registration Number | VIN | Known Location |
|---|---|---|---|---|---|---|
| 45 | Battle, Kelly Darnell | 2002 Cadillac Deville | Black | 7K67R Wildlife | 1G6KF57952U141797 | Warm Springs |

## ATTACHMENT "C"

## ITEMS TO BE SEIZED

The following described documents, records, and equipment, whether in the form of printed documents or stored in computer memory or on computer storage disks or other computer storage mediums, for the period of January 2004 through the present date, relative to the investigation of KELLY DARNELL BATTLE d/b/a K&K LOGISTICS, K&K TRUCKING, K.B. TRUCKING, K.B. LOGISTICS, and/or ELITE TRANSPORTATION:

1. Books, records, receipts, notes, ledgers, catalogs, purchase orders, shipping documents, faxes, and other papers relating to the ordering, purchase, and distribution of controlled substances. All records, documents, literature, and documentation relating to use of controlled substances.

2. Documents and other items that reflect the purchase and ownership of assets, vehicles, land, buildings, and storage locations used in conjunction with the transportation, ordering, sale, purchase, and distribution of controlled substances, and equipment and/or vehicles utilized in transporting, ordering, sale of, purchase of, and distribution of controlled substances and the laundering of drug proceeds.

3. Any and all records relating to the identity and/or communications with associates, including but not limited to, telephone records, cellular phones, rolodex, address book, phone book and photographs.

4. Papers, tickets, notes, schedules, receipts, air line receipts, hotel receipts, and other travel documents relating to domestic travel, including, but not limited to travel to, from and between Georgia, Alabama, New Jersey, Texas, Arizona, and New Mexico.

5. Books, records, closing sheets, receipts, credit card statements, billing statements, bank statements and records, for both foreign and domestic accounts, money drafts, letters of credit, money orders and cashier's check receipts, passbooks, bank checks, bank deposit items, certificates of deposit, property deeds, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment, and/or expenditure of money.

6. Tax Returns, both federal, state and local, relating to years 2002 through 2006.

7. United States currency, precious metals, jewelry, and financial instruments, including, but not limited to stocks, bonds, and certificates of deposit.

1

8. Any and all banking records pertaining to financial transactions at banking institutions including bank statements, check registers, deposit slips, or tickets, withdrawal slips, wire transfers, and canceled checks for any and all bank accounts, both foreign and domestic, including all funds on deposits such as certificates of deposit, money market accounts and bank safety deposit box records and keys.

9. Receipts and invoices for all expenditures including both personal and business.

10. Handwritten and/or computerized inventory journals or any other documentation showing beginning inventory, purchases, and ending inventory.

11. Financial statements, loan applications, mortgage documents, real estate deeds, purchase agreements, car titles, sales contracts, insurance polices and related documents, written correspondence, and other documents relating the purchase of assets. Documents that reflect the ownership and maintenance of the premises.

12. Any and all records reflecting assets and liabilities, including but not limited to, income and expense records, profit and loss statements, ledgers, and accounting records.

13. Any and all records, books and documents relating to communications between persons conspiring to defraud the DEA and/or Internal Revenue Service, or preparations by such conspirators to conceal or prevent the full detection by law enforcement authorities of such a fraud, including correspondence, telephone toll records, agreements, wire transfers, faxes, research memoranda, and notes.

14. All of the foregoing items of evidence enumerated in paragraphs 1 through 14 in whatever form and by whatever means, the terms "records," "documents," and "materials" include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, or materials, their drafts, or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing, drawing, painting, with any implement on any surface, directly, or indirectly, any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); any mechanical form (such as phonograph records, printing, or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs), or any information on an electronic or magnetic storage device, (such as floppy diskettes, hard disks, backup tapes, CD Roms, optical discs, printer buffers, smart cards, memory calculators, electronic dialers, Bermulli drives, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

15. Any and all computers including laptop, palm pilot, notebook, PC tablet, and personal/desktop computer(s) and/or computer data – any and all information and/or data stored in the form of magnetic or electronic coding on a computer media or on media capable of being read by a computer or with the aid of computer related equipment.  This media includes, but is not limited to, floppy diskettes, fixed "hard" disks, removable hard disks cartridges, tapes, laser disks, video cassettes, and any other media which is capable of storing magnetic coding.